**METROPOLITAN LIFE INSURANCE COMPANY, Appellant,**

v.

**Charles G. HANEY, Appellee.**

**No. 14–96–01096–CV.**

Court of Appeals of Texas,
Houston (14th Dist.).

March 18, 1999.

Rehearing Overruled April 18, 1999.

Mike M. Tabor, Theresa Mary Gegen, Dallas, John Zavitsanos, Andrew S. Golub, Houston, for appellant.

Macon D. Strother, Houston, for appellee.

Panel consists of Chief Justice MURPHY and Justices HUDSON and DRAUGHN.*

* Senior Justice Joe L. Draughn sitting by assign-

## OPINION ON REHEARING

J. HARVEY HUDSON, Justice.

Appellant's motion for rehearing is granted, our previous opinion issued January 14, 1999 is withdrawn, and the following opinion is issued in its place.

Appellant, Metropolitan Life Insurance Company, appeals a jury verdict in favor of appellee, Charles G. Haney. In eight points of error, MetLife challenges the judgment of the trial court, while Haney brings two cross-points of error. We reverse and render judgment.

### I. Background

Haney sold insurance for MetLife from August 1992, until October 1993. MetLife recruited Haney, who had twenty-eight years of experience in selling insurance, because he was one of the top sellers in the Houston area. Dennis Onda was employed by Met-Life as a sales representative. Onda, who had been with MetLife for only a year, found two prospective clients, Steven Kirk and Wayne Woods, the owners PSA Pumbing Sales, who wanted to purchase "key man" life insurance for their business. Onda met with Kirk and when it appeared to Onda that Kirk wanted to purchase a substantial policy, Onda explained to Kirk that while he did not have the experience to handle a large sale, he could bring in a more experienced sales representative.

Onda talked to Douglas Sharp, MetLife's Brookhollow Branch Manager, about bringing someone in to assist him with the sale. Haney had been with MetLife for about a week when Sharp approached him about the prospective sale to Kirk and Woods. Haney agreed to assist Onda with the presentation and sale to Kirk and Woods. Haney met with Kirk. After determining what Kirk wanted in terms of life insurance, Haney said he would draft a proposal.

MetLife had a computer program known as "Quantum" for drafting sales proposals for prospective clients. MetLife had contracted with ECTA Corp., which builds sales illustration systems for life insurance companies, to

ment.

design Quantum. MetLife, in turn, sold the Quantum software to its agents for $25. Haney, who did not know how to use Quantum, provided Sharp with the information to use in creating a proposal for Kirk and Woods. Sharp gave Haney the proposal he generated with Quantum. Haney, in turn, used the Quantum generated proposal in drafting an overall proposal, which he presented to Kirk and Woods.

Haney ultimately sold four $1,000,000 policies to Kirk and Woods. Haney and Onda split the $25,000 commission from the sale. The policies, which Kirk and Woods purchased, were in place by November 1992.

In May 1993, Sharp learned there was a problem with the Kirk and Woods policies when they had stopped payment on their monthly bank draft. Sharp informed Onda and Haney and asked them to find out why Kirk and Woods had stopped payment on the policies. Haney unsuccessfully tried to reach Kirk and Woods by telephone and letter. When Haney had received no response, he went to Kirk and Woods's office unannounced. Rather than see Haney Kirk phoned his attorney. After speaking with his attorney, Kirk told Haney that he could not talk to him and that Haney should leave his office.

On June 25, 1993, Kirk and Woods's attorney, Gene Human, sent a demand letter to MetLife, Haney, and Onda. Alleging a number of misrepresentations, Kirk and Woods demanded that MetLife rescind the policies, refund the premiums they had paid, and pay their attorney's fees.

The letter alleged that Haney falsely represented to them that for ten years, beginning at age 65, they could withdraw $160,000 per year from each policy, for an accumulated total of $1.6 million, while the remaining net cash value in the policy would have increased. In short, the proposal presented to them did not take into consideration the $160,000 loans when calculating the policies' net cash value.

Kirk and Woods accused Haney and MetLife of using only selected information, while omitting other material information from the sales presentation. The Kirk and Woods proposal did not contain a "Standard Presentation Ledger Statement" (SPLS). The Quantum-generated "illustrative cash value column," did not take into account any outstanding loans or cash withdrawals made from the policy. The SPLS, however, contained additional columns which took into consideration loans and cash withdrawals before calculating the cash value of the policy. Each Quantum-generated page contains the statement, "This illustration is not valid unless accompanied by a Standard Presentation Ledger Statement."

Haney claims Sharp did not provide him with the SPLS and that he did not know the illustrative cash value column did not consider loans made against the policy when calculating the policy's net cash value. MetLife, on the other hand, asserts Haney had the SPLS, but chose to omit it from his proposal.

After receiving the demand letter, Haney went to Kirk and Woods's office and threatened that if they "wanted to play games, Mother Met had a lot of money." Bill Foster of MetLife investigated the matter. At Kirk and Woods's request, Haney was not involved in the investigation.

On July 15, 1993, Haney's attorney wrote MetLife demanding that MetLife write to Kirk and Woods explaining that Haney (1) did not intentionally misrepresent any figures in the proposal because he did not know the Quantum-generated proposal, provided by MetLife, did not represent the correct net cash value, and (2) did not omit select pages from the proposal. Haney also demanded that MetLife allow him to keep his commission from the sale, rather than charging it back to him.

On July 16, 1993, MetLife wrote Kirk and Woods's attorney explaining that the wrong values were inadvertently used in the illustrated sales proposal. On July 29, 1993, MetLife rescinded the policy, refunded the paid premiums, and paid Kirk and Woods's attorney's fees. Kirk testified at trial that he was satisfied with the way in which MetLife handled the matter.

On October 25, 1993, Haney filed suit against MetLife, Fred Fiegley, vice president of MetLife in Houston, Sharp, Kirk, and

Woods. Haney alleged claims for negligent misrepresentation and violations of the Texas Deceptive Trade Practices Act (DTPA) and the Insurance Code against MetLife, Feigley, and Sharp; negligence and breach of contract against MetLife; and defamation against Kirk and Woods. On August 9, 1994, Feigley and Sharp were nonsuited. Kirk and Woods were nonsuited on February 9, 1995.

Haney filed three amended petitions adding Onda, Lumen Systems, Inc.-which copied and distributed the Quantum disks for Met-Life–ECTA, and Sharp, again. Haney also added claims for third-party breach of contract, breach of implied warranty of merchantability, and fraud.

MetLife moved for summary judgment on all of Haney's claims. On June 27, 1995, the trial court granted summary judgment on Haney's claims for third-party beneficiary breach of contract, breach of the implied warranty of merchantability, and insurance code violations. On the agreement of Haney, these same claims against Sharp and Onda were also subsequently dismissed. In the fourth amended original petition, Lumen was no longer included as a defendant.

On August 1, 1994, MetLife filed a counterclaim against Haney alleging breach of contract and seeking the recovery of $17,-668.59 in cash advances. Prior to trial, ECTA settled with Haney for $17,500.

Haney and the remaining defendants-MetLife, Sharp, and Onda-proceeded to trial on Haney's claims for negligence, negligent misrepresentation, fraud, and DTPA violations. The jury found (1) Haney and MetLife each were fifty percent negligent and awarded Haney $50,000 for loss of earning capacity; (2) MetLife had made a negligent misrepresentation and awarded Haney $50,000 for pecuniary loss; (3) MetLife had violated the DTPA, but its conduct was not "knowing," and awarded Haney $50,000 for loss of earning capacity and $4,750 for mental anguish damages; and (4) MetLife had committed fraud, but had not acted with malice, and awarded Haney $27,500 for pecuniary loss. The jury did not find either Sharp or Onda

liable on any of Haney's claims. The jury further awarded Haney attorney's fees in the amount of $106,000–$95,000 for preparation through trial; $3,500 for appeal to the court of appeals; $2,500 for request for or response to application for writ of error to the Texas Supreme Court; and $5,000 if writ is granted.

Prior to trial, MetLife elected the "dollar-for-dollar" credit with regard to ECTA's $17,500 settlement with Haney. See TEX. CIV. PRAC. & REM.CODE ANN. § 33.012(b) (Vernon 1997). At trial, Haney stipulated that he owed MetLife $17,668.59 for cash advances and agreed that such amount would be deducted from any recovery from MetLife. With respect to the duplicate awards for loss of earning capacity for his negligence and DTPA claims, Haney elected to proceed under the DTPA. Haney, however, chose not to make an election with regard to the jury's $50,000 award for pecuniary loss on his negligent misrepresentation claim and the award for loss of earning capacity for his DTPA claim because, according to Haney, his damages under these theories were based on separate acts. Although a review of the record does not reflect that Haney expressly made an election between fraud and negligent misrepresentation on the respective awards for pecuniary loss, apparently an election was made for negligent misrepresentation because it yielded a higher recovery.

On May 10, 1996, the trial court entered final judgment. First, the court found that because the jury did not find that MetLife's false or misleading statements in violation of the DTPA were made "knowingly," the jury's award of $4,750 for mental anguish must be disregarded. Next, the court, apparently finding loss of earning capacity under the DTPA and pecuniary loss for negligent misrepresentation and fraud to be duplicate recoveries, made an election for Haney. Therefore, the court determined Haney could recover from MetLife $14,831.41–$50,0000 under the DTPA, reduced by the $17,500 ECTA settlement credit and the $17,668.59 stipulated value for MetLife's breach of contract claim. The court finally determined the jury's award of attorneys' fees would stand.[1]

---

1. Haney moved for the trial court to enter judgment on the $50,000 award for pecuniary loss

On appeal, MetLife challenges the legal and factual sufficiency of the evidence that (1) Haney was a "consumer" under the DTPA, (2) Haney suffered loss of earning capacity, (3) MetLife's conduct was intentional, (4) Haney suffered pecuniary losses, and (5) Haney suffered reliance damages. MetLife further asserts Haney has no basis for the recovery of attorney's fees in the absence of recovery on his DTPA claim, and Haney cannot have additional recovery under alternative theories in the event his DTPA claim is affirmed.

Haney raises two cross-points claiming the trial court erred in denying his motion to disregard selected jury findings with respect to (1) the attorneys' fees because such findings were against the great weight and preponderance of the evidence, and (2) the reduction in the amount of damages from $100,000 to $50,000.

## II. Standards of Review

### A. Legal Sufficiency

When reviewing a challenge to the legal sufficiency of evidence, *i.e.*, a "no evidence" point of error, the reviewing court may consider only the evidence and inferences that support the challenged findings and should disregard all evidence and inferences to the contrary. *See ACS Inv., Inc. v. McLaughlin,* 943 S.W.2d 426, 430 (Tex.1997); *Leitch v. Hornsby,* 935 S.W.2d 114, 118 (Tex.1996). If there is more than a scintilla of evidence to support the finding, the claim is sufficient as a matter of law, and any challenges merely go to the weight of the evidence. *See Browning–Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 928 (Tex.1993). The court may sustain a "no-evidence" point of error if the record reveals one of the following:

(1) a complete absence of a vital fact;

(2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact;

(3) the evidence offered to prove a vital fact is no more than a scintilla; and

(4) the evidence established conclusively the opposite of the vital fact.

*See Uniroyal Goodrich Tire Co. v. Martinez,* 977 S.W.2d 328, 334 (Tex.1998); *Merrell Dow Pharm., Inc. v. Havner,* 953 S.W.2d 706, 711 (Tex.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1799, 140 L.Ed.2d 939 (1998). There is some evidence when the proof supplies a reasonable basis upon which reasonable minds could reach different conclusions about the existence of a vital fact. *See Orozco v. Sander,* 824 S.W.2d 555, 556 (Tex.1992). When the reviewing court sustains a "no evidence" point, it is the court's duty to render judgment for the appellant because that is the judgment the trial court should have rendered. *See Vista Chevrolet, Inc. v. Lewis,* 709 S.W.2d 176 (Tex.1986); *National Life & Accident Ins. Co. v. Blagg,* 438 S.W.2d 905, 909 (Tex.1969).

### B. Factual Sufficiency

In reviewing a challenge that the jury's finding is against the great weight and preponderance of the evidence, we must examine the entire record to determine if there is some evidence to support the finding. *See Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 406–07 (Tex.), *cert. denied,* —— U.S. ——, 119 S.Ct. 541, 142 L.Ed.2d 450 (1998); *Oadra v. Stegall,* 871 S.W.2d 882, 892 (Tex.App.-Houston [14th Dist.] 1994, no writ). After considering and weighing all the evidence, we shall set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong or unjust. *See Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Peter v. Ogden Ground Servs., Inc.* 915 S.W.2d 648, 649 (Tex.App.-Houston [14th Dist.] 1996, no writ). The jury as trier of fact is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *See Times Herald Printing Co. v. A.H. Belo Corp.,* 820 S.W.2d 206, 213 (Tex.App.-Houston [14th

under his claim for negligent misrepresentation and the $4,750 award for mental anguish in addition to the $50,000 award for loss of earning capacity under the DTPA. Haney also moved for the court to disregard the jury's findings on attorneys' fees with respect to the $3,500 award for

appeal to the court of appeals and the $2,500 award for a request for or response to application for writ of error and, instead, award him $15,000 and $3,500, respectively. The trial court denied Haney's motion.

Dist.] 1991, no writ). Because the appellate court is not the fact finder, it may not substitute its own judgment for that of the trier of fact, even if a different answer could be reached on the evidence. *See Maritime Overseas Corp.*, 971 S.W.2d at 407; *Peter*, 915 S.W.2d at 649; *Times Herald Printing Co.*, 820 S.W.2d at 213. When sustaining a factual sufficiency challenge, a court of appeals must state the reason the jury's finding is so against the great weight and preponderance of the evidence supporting the trial court's judgment. *See Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex.1996).

### III. Consumer Status under the DTPA

In its first two points of error, MetLife contends the evidence is both legally and factually insufficient to establish Haney is a "consumer" under the DTPA.[2]

The DTPA prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce...." TEX. BUS. & COM.CODE ANN. § 17.46(a) (Vernon 1987). To recover under the DTPA, the plaintiff must establish that (1) he was a consumer of the defendant's goods or services, (2) the defendant committed false, misleading, or deceptive acts in connection with the lease or sale of goods or services, and (3) such acts were a producing cause of actual damages to the plaintiff. *See Brown v. Bank of Galveston, N.A.*, 963 S.W.2d 511, 513 (Tex.1998).

A "consumer" is someone who seeks to purchase or lease goods or services. *See* TEX. BUS. & COM.CODE ANN. § 17.45(4) (Vernon 1987); *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 815 (Tex.1997). To qualify as a consumer, the plaintiff must satisfy two requirements: (1) he must have sought or acquired the goods or services by purchase or lease, and (2) the goods or services must form the basis of the complaint. *See Vinson & Elkins v. Moran*, 946 S.W.2d 381, 406-07 (Tex.App.-Houston [14th Dist.] 1997, writ dism'd by agr.); *Hand v. Dean Witter Reynolds, Inc.*, 889 S.W.2d 483, 496 (Tex.App.-Houston [14th Dist.] 1994, writ denied) (citing *Cameron v. Terrell & Garrett,*

*Inc.*, 618 S.W.2d 535, 539 (Tex.1981)). The plaintiff, however, need not establish contractual privity with the defendant in a DTPA claim. *See Amstadt v. United States Brass Corp.*, 919 S.W.2d 644, 649 (Tex.1996). A party's consumer status does not turn on whether there is a contractual relationship with the defendant, but rather, it is determined by the parties' relationship to the transaction. *See Arthur Andersen & Co.*, 945 S.W.2d at 815. Whether a plaintiff is a consumer is a question of law. *See Wright v. Gundersen*, 956 S.W.2d 43, 47 (Tex.App.-Houston [14th Dist.] 1996, no writ).

There is no dispute that Haney did not purchase the Quantum software. Haney asserts that his consumer status is established because MetLife intended for the Quantum software to be purchased and used by its agents, primarily for the benefit of the agents. In support of this contention, Haney relies on *Kennedy v. Sale*, 689 S.W.2d 890 (Tex.1985). In *Kennedy*, the board of managers for Martin County Hospital purchased an insurance policy for its employees. *Id.* at 891. The insurance agent, Sale, met with hospital employees to explain the new policy and its benefits. *Id.* After the policy was in force, one of the hospital district's employees, Kennedy, underwent surgery for a pre-existing condition. *Id.* The insurance company paid only part of the medical bill and Kennedy sued Sale, alleging he had violated the DTPA by misrepresenting the pre-existing condition coverage. *Id.*

The court held Kennedy "acquired" the policy benefits "by purchase" because the policy was purchased for his benefit by the hospital district. *Id.* Thus, when an employer purchases goods or services for the benefit of an employee, the employee has consumer status under the DTPA if the goods or services form the basis of his complaint. *Id.*

MetLife contends that any benefit Haney derived from the Quantum software was merely incidental. In *Clark Equip. Co. v. Pitner*, the court addressed an employee's consumer status when the employer pur-

---

**2.** Haney asserts MetLife failed to preserve error on appeal, but a review of the record reveals that MetLife raised this issue in its motions for direct-ed verdict, for judgment *non obstante veredicto*, and for new trial, thus, preserving error. *See* TEX. R. APP. P. 33.1

chases the goods or services primarily for its own benefit, but incidentally benefits the employee. 923 S.W.2d 117 (Tex.App.-Houston [14th Dist.] 1996, writ denied). A forklift manufactured by Clark Equipment Co. and shipped to Southline Equipment Co., was sold to Hughes Tool Co., Pitner's employer. *Id.* at 121. As Pitner proceeded down a ramp leading to the basement and tilted the forks of the forklift to keep the load level, the engine died. *Id.* The forklift continued traveling down the ramp and as it reached the bottom, Pitner jumped off severely injuring her right leg. *Id.*

Pitner brought suit against Clark and Southline alleging violations under the DTPA. Pitner argued that she "acquired" the forklift because Hughes purchased it for the use of its employees in the shipping and receiving department; therefore, Pitner, as an employee in that department, benefitted from the use of the forklift. *Id.* at 128. The court found that for an employee to "acquire" goods or services purchased or leased by his employer, the employee must establish that the employer's primary purpose for purchasing or leasing the goods or services is to benefit the employee. *See Brandon v. American Sterilizer Co.,* 880 S.W.2d 488, 492 (Tex.App.-Austin 1994, no writ); *see also Kitchener v. T.C. Trailers, Inc.,* 715 F.Supp. 798, 801 (S.D.Tex.1988); *Lara v. Lile,* 828 S.W.2d 536, 542 (Tex.App.-Corpus Christi 1992, writ denied). Concluding there was no evidence that Hughes purchased the forklift for the personal or individual benefit of Pitner, or any purpose other than the ordinary operation of its business, the court found the use and benefit of the forklift extended to Pitner only incidentally; therefore, she did not "acquire" it and did not qualify as a "consumer" under the DTPA. *Id.*[3]

Dennis Pritchard (Pritchard), an advanced underwriting consultant at MetLife, testified the purpose of developing the Quantum software was to make its agents "competitive with what the rest of the industry was able to prepare in terms of illustrations," and "to even out the competitive playing field." Pritchard further stated that even though the software would be of benefit to MetLife's agents by assisting them in the sale of MetLife products, MetLife would benefit from its agents selling more MetLife policies.

The evidence does not show that MetLife's primary purpose in developing and selling the Quantum software to its agents was for the benefit of the agents. Instead, the evidence shows that any benefit derived by the agents in using the Quantum software was merely incidental as MetLife's ultimate goal was to increase the sale of its products. We find there is no evidence Haney was a consumer in the purchase of the Quantum software. MetLife's first and second points of error are sustained.

### Attorney's Fees

■ In its fourth point of error, MetLife claims, in the absence of consumer status, Haney cannot prevail under the DTPA and, therefore, cannot recover attorney's fees. The DTPA provides for the recovery of attorney's fees to a prevailing plaintiff. *See* TEX. BUS. & COM.CODE ANN. § 17.50(d) (Vernon Supp.1998). As concluded above, Haney failed to establish his status as a consumer under the DTPA and, consequently, may not recover any damages, including attorney's fees, under the DTPA. Haney's other causes of action were negligence, negligent misrepresentation, and fraud. Attorney's fees, however, are not recoverable on tort claims. *See Villasenor v. Villasenor,* 911 S.W.2d 411, 420

---

**3.** The Austin Court of Appeals addressed the same issue. In *Brandon,* Seton Medical Center purchased two gas sterilizers from American Sterilizer Company (AMSCO). 880 S.W.2d at 490. Brandon, a Seton employee, worked as a cardiopulmonary equipment specialist. *Id.* Part of her duties included the loading of hospital equipment into the gas sterilizers that used ethylene oxide, a toxic gas. *Id.* On the occasion in question, Brandon arrived at work to find an AMSCO maintenance person working on one of the sterilizers. *Id.* After he left, the sterilizer began to leak and Brandon was exposed to toxic gas. *Id.*

Brandon sued AMSCO under the DTPA for injuries resulting from her exposure to the toxic gas. *Id.* at 489. The court determined when the goods or services are purchased for the primary purpose of benefitting the business, and any use or benefit of those products extends to the employee only incidentally, the employee is not a "consumer" under the DTPA and consequently, does not have standing to maintain such a cause of action. *Id.* at 492.

(Tex.App.-San Antonio 1995, no writ). In the absence of recovery under the DTPA, there is no basis for Haney to recover attorney's fees. *See Parkway Co. v. Woodruff,* 901 S.W.2d 434, 441 (Tex.1995). MetLife's fourth point of error is sustained.

Haney, in his first cross-point, asserts the jury's finding on attorney's fees in the event of an appeal is against the great weight and preponderance of the evidence. Because we are sustaining MetLife's point of error on this issue, it is not necessary to address Haney's first cross-point of error and it is overruled.

## IV. Damages

### A. Loss of Earning Capacity

In its third point of error, MetLife challenges the legal and factual sufficiency of the evidence supporting the jury's finding that Haney suffered lost earning capacity or the amount of such earning capacity with reasonable certainty.[4]

 Because Haney is not a consumer, he cannot recover any damages for loss of earning capacity under the DTPA. Generally, an injured party is entitled to one satisfaction. *See Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 7 (Tex.1991). A party who tries a case on alternative theories of recovery and obtains jury findings favorable on two or more theories has the right to judgment on the theory entitling him to the greatest relief. *See St. Paul Ins. Co. v. Rakkar,* 838 S.W.2d 622, 630 (Tex.App.-Dallas 1992, writ denied). That party may seek recovery under an alternative theory if the judgment is reversed on appeal. *See Boyce Iron Works, Inc. v. Southwestern Bell Tel. Co.,* 747 S.W.2d 785, 787 (Tex.1988). It is not necessary for the plaintiff to raise the issue of alternative grounds for recovery until the court of appeals renders judgment reversing recovery. *Id.* The appellate court should consider the alternative theories and, if possible, render judgment thereon instead of remanding to the trial court for rendition of judgment under an alternative theory. *See Rakkar,* 838 S.W.2d at 630. Because we are

reversing Haney's recovery under the DTPA, we must examine MetLife's point of error on loss of earning capacity with regard to Haney's claim for negligence.

 Loss of earning capacity is the diminished earning power of the plaintiff directly resulting from the injuries sustained. *See Southwestern Bell Tel. Co. v. Sims,* 615 S.W.2d 858, 864 (Tex.Civ.App.-Houston [1 st Dist.] 1981, no writ). Loss of earning capacity encompasses the plaintiff's ability to work after the date of trial. *See Border Apparel–East, Inc. v. Guadian,* 868 S.W.2d 894, 897 (Tex.App.-El Paso 1993, no writ). There are several factors to consider when ascertaining loss of earning capacity:

> Factors such as stamina, efficiency, ability to work with pain, and the weakness and degenerative changes which naturally result from an injury and from long suffered pain are legitimate considerations in determining whether or not a person has experienced an impairment in future earning capacity ... Our courts have consistently upheld judgments for reduced earning capacity, even though the plaintiff was making as much or even more money after the injury than before, where it was shown that pain, weakness, diminished functional ability or the like indicated that plaintiff's capacity to get and hold a job, or his capacity for duration, consistency or efficiency of work was impaired.

*Tri–State Motor Transit Co. v. Nicar,* 765 S.W.2d 486, 492 (Tex.App.-Houston [14 th Dist.] 1989, no writ) (quoting *Springer v. Baggs,* 500 S.W.2d 541, 544–45 (Tex.Civ.App.-Texarkana 1973, writ ref'd n.r.e.)). Damages for loss of earning capacity do not have to be based on any specific degree of physical impairment, but can be based on a composite of all of the factors affecting earning capacity. *See id.; Goldston Corp. v. Hernandez,* 714 S.W.2d 350, 352 (Tex.App.-Corpus Christi 1986, writ ref'd n.r.e.).

 Haney contends he presented evidence of the nature, duration, and severity of his pain and distress, thereby establishing a

---

4. Haney also asserts in response to this point of error that MetLife has failed to preserve error on this issue. A review of MetLife's motions for judgment *non obstante veredicto* and for new trial reflects that MetLife has preserved error. *See* TEX. R. APP. P. 33.1.

substantial disruption in his life. *See Parkway Co.*, 901 S.W.2d at 444. Haney testified he was "petrified" by the possibility of Kirk and Woods filing a complaint with the state insurance commissioner and losing his license to sell insurance. Haney further feared damage to his reputation from Kirk and Woods telling others about the circumstances surrounding the policies he sold them. Haney testified he felt like he was in a "deep, dark cave" because MetLife was not keeping him informed about the Kirk and Woods matter and he had a "black cloud over [his] head," wondering who knew about this situation. Haney testified he does not have the same level of "work stamina" and feels "deflated and totally concerned about [his] career."

Dr. Tim McMahon, who holds a doctorate in Business Administration with a specialization in organizational behavior, testified for Haney as an expert on the effects of stress and work. Dr. McMahon stated the stress created by the Kirk and Woods incident would affect Haney's job performance. Dr. McMahon also stated the stress would also affect the probability of Haney's cancer recurring. His cancer is currently in remission.

 MetLife claims Haney has not shown sufficient physical impairment-a requirement for recovering for loss of earning capacity. We agree. A survey of Texas cases addressing claims for loss of earning capacity reveals that a plaintiff may recover where he has shown a physical impairment affecting his ability to earn a living. *See, e.g., Hanna v. Lott*, 888 S.W.2d 132, 139 (Tex.App.-Tyler 1994, no writ) (determining that although there was evidence of physical pain and mental anguish from accident, there was no evidence of bodily injury impairing ability to earn living for an extended period of time); *Border Apparel–East, Inc.*, 868 S.W.2d at 898 (concluding that plaintiff had failed to present evidence of stamina, efficiency, weakness or other degenerative changes which occurred as result of injury and, therefore, could not recover for loss of

earning capacity); *Tri–State Motor Transit Co.*, 765 S.W.2d at 492 (finding that plaintiff's evidence of continuing physical pain and limitations due to injuries sustained in accident, which interfered with job duties, supported claim for loss of earning capacity); *Ceiling Fan Warehouse, Inc. No. 3 v. Morgan*, 723 S.W.2d 195, 199 (Tex.App.-Houston [1 st Dist.] 1986), *aff'd as modified*, 725 S.W.2d 715 (Tex.1987) (holding that plaintiff's evidence did not establish that degenerated physical condition was attributed solely to injury and, therefore, could not support claim for loss of earning capacity); *Goldston Corp.*, 714 S.W.2d at 352 (finding that physician's testimony regarding plaintiff's impairment resulting from physical injury supported loss of earning capacity claim).

Furthermore, Haney's reliance on *Parkway Co.* is misplaced. *Parkway Co.* involves a claim for mental anguish, not loss of earning capacity. Moreover, the evidence Haney recites in support of his claim for loss of earning capacity is of the nature and character required to support the recovery of mental anguish damages. Thus, Haney has failed to establish damages for loss of earning capacity. MetLife's third point of error is sustained.

## B. Pecuniary Loss

In its seventh point of error, MetLife claims there was legally and factually insufficient evidence that Haney suffered pecuniary losses or establishing the amount of any such losses.[5]

 To recover for fraud, the plaintiff must plead and prove he suffered a pecuniary loss as a result of the false representation upon which he relied. *See DiGrazia v. Atlantic Mut. Ins. Co.*, 944 S.W.2d 731, 735 (Tex.App.-Texarkana 1997, no writ). Under Texas common law, direct damages for fraud are measured in two ways-out-of-pocket and benefit-of-the-bargain. *See Formosa Plastics Corp. U.S.A. v. Presidio Eng'r & Contractors, Inc.*, 960 S.W.2d 41, 49 (Tex.1998); *Arthur Andersen & Co.*, 945 S.W.2d at 817.

---

5. Haney, again, contends MetLife failed to complain to the trial court on this point of error. We find MetLife raised this issue in its motions for directed verdict, for judgment *non obstante veredicto*, and for new trial. *See* Tex. R. App. P. 33.1.

The out-of-pocket measure computes the difference between the value the buyer has paid and the value of what he has received. *See Formosa Plastics Corp.*, 960 S.W.2d at 49; *Arthur Andersen & Co.*, 945 S.W.2d at 817. The out-of-pocket measure compensates for actual injuries sustained through the plaintiff's parting with something of value; it does not compensate for "loss of profits, a bid not made, and a profit never realized, in a hypothetical bargain never struck." *See Formosa Plastics Corp.*, 960 S.W.2d at 49–50.

■ The benefit-of-the-bargain measure computes the difference between the value as represented and the value received. *Id.* at 49; *Arthur Andersen & Co.*, 945 S.W.2d at 817. Under the benefit-of-the-bargain method, the plaintiff can recover lost profits only if they are proved with reasonable certainty. *See Formosa Plastics Corp.*, 960 S.W.2d at 50 (citing RESTATEMENT (SECOND) OF TORTS § 549(2) (1977)). Although the benefit-of-the-bargain measure can include loss of profits, it compensates only the profits the plaintiff would have made if the bargain had been performed as promised. *Id.*

■ The benefit-of-the-bargain measure of damages is not available in a claim for negligent misrepresentation. *See D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 663 (Tex.1998). In negligent misrepresentation, generally, the plaintiff can recover only the amount necessary to compensate for direct pecuniary loss. *See Williams v. City of Midland*, 932 S.W.2d 679, 685 (Tex.App.-El Paso 1996, no writ).[6] Therefore, lost profits are not available in a claim for negligent misrepresentation. *Id.*

■ MetLife contends there is no evidence of out-of-pocket losses. We agree. A review of the record reflects Haney failed to assert any out-of-pocket damages, *i.e.*, that

he parted with something of value. Therefore, Haney has failed to establish damages for negligent misrepresentation. If Haney is to recover for fraud, he must establish damages under the benefit-of-the-bargain measure. MetLife asserts the only relevant profits are those from the Kirk and Woods sale. Haney, however, was allowed to keep his commission on that sale. MetLife argues that lost profits, if any, are not recoverable because Haney did not prove them by competent evidence with reasonable certainty.

■ Although the recovery of lost profits does not require that the loss "be susceptible to exact calculation," the plaintiff must do more than demonstrate that he suffered some lost profits. *See Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex.1992) (citing *White v. Southwestern Bell Tel. Co.*, 651 S.W.2d 260, 262 (Tex.1983); *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1098 (1938)). Rather, the plaintiff must show the amount of his loss by competent evidence with reasonable certainty. *See id.*

The Texas Supreme Court explained, "[t]he requirement of 'reasonable certainty' in the proof of lost profits is intended to be flexible enough to accommodate the myriad circumstances in which claims for lost profits arise." *Texas Instruments, Inc. v. Teletron Energy Management, Inc.*, 877 S.W.2d 276, 279 (Tex.1994). The court, however, cautioned the "reasonable certainty" test does not lack "clear parameters." *See id.* The court listed the following factors:

> Profits which are largely speculative, as from an activity dependent on uncertain or changing market conditions, or on chancy business opportunities, or on promotion of untested products or entry into unknown or unviable markets, or on the success of a

---

**6.** The Texas Supreme Court adopted RESTATEMENT (SECOND) OF TORTS § 552B (1977), limiting damages for negligent misrepresentation to pecuniary loss:

> (1) The damages recoverable for a negligent misrepresentation are those necessary to compensate the plaintiff for the pecuniary loss to him of which the misrepresentation is legal cause, including:

> (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and
> (b) pecuniary loss suffered otherwise as a consequence of the plaintiff's reliance upon the misrepresentation.
> (2) the damages recoverable for a negligent misrepresentation do not include the benefit of the plaintiff's contract with the defendant.
> *Federal Land Bank Ass'n v. Sloane*, 825 S.W.2d 439, 442 (Tex.1991).

new and unproven enterprise, cannot be recovered. Factors like these and others which make a business venture risky in prospect preclude recovery of lost profits in retrospect.

*Id.*

What constitutes "reasonably certain" evidence of lost profits involves a fact intensive determination. *See Holt Atherton Indus.*, 835 S.W.2d at 84. At a minimum, estimates of lost profits must be based upon "objective facts, figures, or data from which the amount of lost profits can be ascertained." *Id.* "When a review of the surrounding circumstances establishes that the profits are not reasonably certain, there is no evidence to support the lost profits award." *Formosa Plastics Corp.*, 960 S.W.2d at 50 n. 3 (citing *Texas Instruments, Inc.*, 877 S.W.2d at 279–81).

Haney asserts he lost a sale to Tommy Rice, owner of Rice Construction, because of the incident with Kirk and Woods. Rice was a referral whom Haney had contacted regarding the purchase of a policy. Haney and Rice arranged a meeting. Rice told Haney to call to confirm the appointment the day before they were to meet. When Haney called, Rice cancelled the meeting. Haney testified he would have made the sale to Rice. He based this belief on his original conversation with Rice. According to Haney, Rice was going to purchase a $5 million policy and therefore, he would have earned a commission of $30,000.

Woods testified that he was in Rice's office and noticed Haney's business card on his desk. Woods mentioned to Rice that he was involved in a lawsuit with Haney. Woods, however, did not mention that Haney had made any misrepresentations to him. Rice did not testify at trial. Therefore, there is no testimony from Rice regarding whether he would have purchased the policy from Haney or his reason for canceling his meeting with Haney.

Haney further contends he lost a sale to Midwest Electric. Haney testified that while making a presentation to the owner of Midwest Electric, he discovered an error in the proposal given to him by Sharp. According to Haney, the error was similar to the one in the Kirk and Woods proposal. Midwest did not purchase any insurance from Haney. Haney presented no evidence regarding the amount of insurance Midwest purportedly was going to purchase.

Finally, Haney testified in his opinion he lost $250,000 in commissions from the joint work he was to have with other MetLife agents. Haney testified that he had written to Feigley that he had spoken to other agents in Brookhollow office about helping them with their sales, which meant the sharing of commissions, but the other agents were not receptive to Haney's offers. Haney presented no other evidence regarding the alleged loss of $250,000 in commissions from joint work.

We find Haney's contentions that he would have completed any sale to Rice or Midwest Electric are based on nothing more than conjecture. Neither Rice nor anyone from Midwest Electric testified that any purchase would have been made but for the problems Haney had with Kirk and Woods or the error in the Quantum-generated proposal. Haney further failed to establish with reasonably certainty, based upon any objective facts or figures, that he would have earned $250,000 in commissions from working with other agents, even if the other agents had been willing to share their sales with him. Because Haney has failed to prove any lost profits with reasonable certainty, there is no evidence to support any award of lost profits under the benefit-of-the-bargain measure. *See Formosa Plastics Corp.*, 960 S.W.2d at 50 n. 3. Haney, therefore, has not established his damages for fraud. MetLife's seventh point of error is sustained.

Because Haney has failed to establish any damages for fraud or negligent misrepresentation, we need not address MetLife's remaining points of error or Haney's remaining cross-point. Accordingly, we affirm the portion of the trial court's judgment awarding MetLife $17,668.59 on its counterclaim against Haney together with prejudgment and postjudgment interest in accordance the terms of the judgment, and we reverse the remainder of the judgment and render judg-

ment that Haney take nothing on his claims against MetLife.